UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES CURTIS KERN,

     Plaintiff,

     v.

SACRAMENTO COUNTY SHERIFF, et al.,

     Defendants.

No.  2:23-cv-0252 DJC AC P

FINDINGS AND RECOMMENDATIONS

Plaintiff, a current state prisoner proceeding pro se and in forma pauperis, seeks relief under 42 U.S.C. § 1983, alleging defendant Dr. Soni Nageswaran acted with deliberate indifference to his serious medical needs when plaintiff was a pretrial detainee at the Sacramento County Jail between October 2022 and March 2024.  ECF No. 11.  Both parties have filed motions for summary judgment.  ECF Nos. 37, 49.  For the reasons stated below, the court recommends that plaintiff's motion for summary judgment (ECF No. 49) be denied as untimely and defendant's motion for summary judgment (ECF No. 37) be granted.

I.    PROCEDURAL HISTORY

Although this case concerns medical care that plaintiff received as a pretrial detainee at the Sacramento County Jail, he is currently a California inmate under the authority of the California Department of Corrections and Rehabilitation ("CDCR").  He was arrested and booked

1

into the Sacramento County Jail on October 7, 2022, where he received medical care from defendant, among other providers.  Plaintiff filed a civil rights complaint in February 2023.  ECF No. 1.  In October 2023, he filed a First Amended Complaint challenging the medical care he had received at the jail from defendant and several other providers.  ECF No. 11.  On screening pursuant to 28 U.S.C. § 1915A(a), the court found that plaintiff's claim that Dr. Nageswaran acted with deliberate indifference to plaintiff's serious medical needs in violation of his Fourteenth Amendment rights was adequate for service, but that his similar claims against two other named defendants were not.  EC No. 12 at 4.  Rather than amend his complaint to cure the deficiencies identified by the court, plaintiff elected to proceed against Dr. Nageswaran only.  ECF No. 13-14.  Defendant filed an answer to the complaint on March 20, 2024.  ECF No. 24.

Following the discovery period and the court's resolution of several discovery motions (ECF Nos. 21, 29, 31, 35), defendant filed a motion for summary judgment (ECF No. 37).  After obtaining an extension of time (ECF Nos. 38, 39), plaintiff timely opposed defendant's motion (ECF No. 40).  Defendant also filed a reply to plaintiff's opposition.  ECF No. 41.

The deadline for dispositive motions set forth in the Court's Scheduling Order was October 4, 2024.  ECF No. 25.  On April 3, 2025, six months after the deadline, plaintiff filed a document titled "Demand for Summary Judgment."  ECF No. 49.  This document did not contain any substantive legal arguments.  See id.  Defendant has opposed plaintiff's motion on the grounds that it is untimely, arguing plaintiff failed to demonstrate diligence or good cause to modify the scheduling order.  ECF No. 50.  In reply, plaintiff filed a document re-stating some of his substantive arguments about the medical care he received from Dr. Nageswaran and why he believes she caused him harm, but plaintiff did not provide any explanation regarding why his motion for summary judgment was filed six months late.  ECF No. 51.

II.   PARTIES' ALLEGATIONS

A.  Plaintiff's First Amended Complaint and Untimely Motion for Summary Judgment

In his First Amended Complaint, plaintiff alleges that his rights under the Fourteenth

Amendment[1] were violated by the inadequate medical care provided by Dr. Nageswaran at the Sacramento County Jail in late 2022.  ECF No. 11 at 3.  Plaintiff alleges she showed "total neglect" for his medical needs by ignoring or delaying treatment.  Id.  She "always turned her back" to plaintiff during medical visits and would only identify herself as "Dr. N." without providing her full name.  Id.  He asserts that defendant refused to inform him of what was in the medications she prescribed to him, which he later learned included psychiatric medications.  Id. Defendant told plaintiff that he would "never make it past her to see a neurologist" and indeed, she prevented him from seeing a neurologist for at least one year.  Id.  Plaintiff alleges that he only learned of his medical diagnoses and nerve damage after a court ordered defendant to disclose this information to plaintiff within 72 hours, which she finally did on December 3, 2022. Id.  Plaintiff alleges that he is "in great pain, with a great loss of range of motion in my left arm" due to a "very painful mass on my forearm," and resulting "paralysis to my left hand and extreme pain to my left arm's bicep."  Id.  Plaintiff believes that he was treated very poorly because the medical staff at the jail did not want to hear about the fact that his medical problems originated when a blood pressure cuff was placed too tightly on his left arm, and he was held in a moldy jail cell.  Id. at 3-4.

As noted above, plaintiff's motion for summary judgment was filed on April 3, 2025, approximately six months after the October 4, 2024 dispositive motions deadline. ECF No. 49. Although plaintiff's motion only set forth a conclusory "demand for summary judgment" and associated relief, his reply brief did include some of his legal and factual contentions regarding Dr. Nageswaran.  ECF No. 51.  Neither filing, however, was accompanied by a motion for leave to file an untimely motion or any explanation for the excessive delay.  Plaintiff's motion for

---

[1]  Although plaintiff also refers to the Eighth Amendment (ECF No. 11 at 3), the Fourteenth Amendment governs his right to be free from cruel and unusual punishment while he was a pretrial detainee at the Sacramento County Jail.  See Vazquez v. County of Kern, 949 F.3d 1153, 1163-64 (9th Cir. 2020) ("[T]he Fourteenth Amendment is more protective than the Eighth Amendment 'because the Fourteenth Amendment prohibits *all* punishment of *pretrial detainees*, while the Eighth Amendment only prevents the imposition of *cruel and unusual* punishment of *convicted prisoners*.'" (quoting Demery v. Arpaio, 378 F.3d 1020, 1029 (9th Cir. 2004))).

summary judgment (ECF No. 49) should therefore be DENIED as untimely.  To the extent that plaintiff's reply brief (ECF No. 51) included some of his legal and factual arguments related to the claims of the First Amended Complaint, the court will construe this document as a supplement brief in support of plaintiff's opposition to defendant's motion for summary judgment.

B.   Defendant's Motion for Summary Judgment

Defendant seeks summary judgment on the grounds that (1) her conduct in treating plaintiff comported with the requisite standard of care; (2) her conduct did not rise to the level of deliberate indifference; and (3) plaintiff was not injured because of the medical treatment provided by defendant.  ECF No. 37-1 at 4.  As a result, defendant contends that plaintiff has not established that she acted with deliberate indifference or violated his rights under the Fourteenth Amendment.  Finally, defendant alleges that even if plaintiff's rights were violated, she is entitled to qualified immunity.  Id. at 14-15.  In support of her motion for summary judgment, defendant has provided a declaration from defense counsel along with plaintiff's medical records from the relevant time period when she was providing him care at the Sacramento County Jail (ECF No. 37-4), her own declaration describing her conduct (ECF No. 37-6), and a declaration from a board-certified emergency room physician addressing the content of the medical records as well as defendant's conduct in relation to the requisite standard of care (ECF No. 37-5).

As discussed in detail below, even construing the evidence in the light most favorable to plaintiff, defendant has established the absence of a genuine issue of material fact and is therefore entitled to summary judgment.

II.   GOVERNING LEGAL STANDARDS

A.   Summary Judgment

In general, summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387

4

(9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To meet this burden, the opposing party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.

B.  Deliberate Indifference to Serious Medical Need

A pretrial detainee has a substantive due process right to adequate medical treatment under the Fourteenth Amendment.  Sandoval v. Cnty. of San Diego, 985 F.3d 657, 667 (9th Cir. 2021) (citing Estelle v. Gamble, 429 U.S. 97, 104–05 (1976)).  "[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard."  Gordon v. County of Orange, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (quoting Castro v. County of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016)).

To prove defendant failed to provide constitutionally adequate medical care, plaintiff must show:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment]; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

Sandoval, 985 F.3d at 669 (quoting Gordon, 888 F.3d at 1125) (brackets in original).  "To satisfy the third element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'"  Id.

///

5

III.   RELEVANT FACTS AND EVIDENTIARY ISSUES

A.  Evidentiary Issues

At the outset, the court notes that plaintiff's opposition to defendant's motion for summary judgment includes a handwritten document entitled "Plaintiff's Concise Statement of Disputed Facts Opposing Defendant's Motion for Summary Judgment," which describes plaintiff's blood pressure readings on various dates, as well as identifying dates when plaintiff experienced certain symptoms or had x-rays or other testing performed.  ECF No. 40.  Plaintiff asserts that "on the following pages in this statement you will review several elevated blood pressure readings Plaintiff suffered, and no actions were taken."  Id. at 2.  Plaintiff's filings do not identify which facts from the Defendant's Statement of Undisputed Facts ("DSUF") are admitted and which are disputed, as required by Local Rule 260(b).[2]  ECF No. 37-2.  The facts in the DSUF are therefore deemed undisputed except as otherwise discussed.  Additional facts have also been taken from plaintiff's verified filings as appropriate.

"Pro se litigants must follow the same rules of procedure that govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). However, it is well-established that district courts are to "construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The unrepresented prisoner's choice to proceed without counsel "is less than voluntary" and they are subject to "the handicaps ... detention necessarily imposes upon a litigant," such as "limited access to legal materials" as

[2]  Plaintiff also filed a "Statement of Undisputed Materials Facts Opposing Declaration of Doctor Gary Vilke, M.D." and "Statement of Undisputed Material Facts Opposing Ashley M. Calvillo's Declaration."  ECF Nos. 40-2, 40-3.  Both documents assert in a conclusory manner that these individuals were provided with an incomplete medical record for their review, with "1,000 missing or redacted pages," and therefore their opinions and conclusions cannot be considered credible.  Although plaintiff claims to have a complete and "unedited" copy of his medical record in his possession, he has not provided any evidence to support his assertion that the treatment records filed by defendant in this case are unauthentic or incomplete such that they fail to show plaintiff's specific encounters with defendant during the relevant timeframe.  Without more, plaintiff's conclusory assertions are insufficient to raise a genuine issue of material fact to preclude summary judgment.

well as "sources of proof." Jacobsen v. Filler, 790 F.2d 1362, 1364 n.4 (9th Cir. 1986) (alteration in original) (citations and internal quotation marks omitted). Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to the requirements of the summary judgment rule. Id. (citation omitted).

Accordingly, given plaintiff's status as a pro se prisoner, the court considers the record before it in its entirety despite plaintiff's failure to be in strict compliance with the applicable rules. However, only those assertions in plaintiff's verified filings, such as his First Amended Complaint (ECF No. 11), opposition brief and associated filings (ECF Nos. 40), or supplemental opposition brief (ECF No. 51) which have evidentiary support in the record will be considered.

B. Undisputed Material Facts

The following material facts are undisputed except as noted.

At the time relevant to the complaint, plaintiff was a pretrial detainee at the Sacramento County Jail. He was booked into the main jail on October 7, 2022. ECF No. 37-2 at 1 (DSUF No. 1). During nursing intake, plaintiff reported a history of Type I diabetes and past car crashes. Id.[3] His blood pressure was elevated and he was prescribed medications and regular blood sugar testing based on his verbal report. Id.; ECF No. 37-4 at 78.

On November 11, 2022, plaintiff was treated by a nursing provider at the main jail for left-sided chest pain. ECF No. 37-2 at 2 (DSUF No. 2). He was initially observed to be clutching his chest but later appeared able to rest comfortably in an examination room. Id. He was previously seen at the Sutter Medical Center on October 22, 2022 for the same complaint of chest pain and received a normal EKG. Id. Plaintiff declined to have his blood pressure re-checked. Id. Plaintiff was not treated directly by defendant during the intake process or this initial visit for complaints of chest pain, although Dr. Nageswaran did later sign off on the nursing provider's November 11, 2022 chart notes. ECF No. 37-4 at 76-77.

---

[3] Contrary to plaintiff's self-report, his treatment notes reflect that plaintiff does not have Type I diabetes but is instead "pre-diabetic" for Type II diabetes. ECF No. 37-4 at 32-33, 36, 43, 49, 57-58. For example, defendant's treatment notes dated April 19, 2023, reflect that she "advised pt again that he does not have DM at this time, still just in prediabetic range, so followed by HbA1cs alone." ECF No. 37-4 at 30.

On January 20, 2023, plaintiff was first treated by Dr. Nageswaran for a variety of complaints relating to reported allergies to meat, mold, and soy.  ECF No. 37-2 at 2 (DSUF No. 3).  He also reported a history of asthma and complained of left shoulder and upper arm pain and feeling a "lump" on his forearm.  Id.  On examination, no mass or other abnormalities were observed.  Id.  Defendant ordered allergy testing, x-rays of his left arm, an orthopedic consultation, and a follow-up appointment in one month.  Id.; see also ECF No. 37-4 at 47-51.

On January 28, 2023, when plaintiff's x-rays were reviewed by other providers, soft tissue lucency was noted in the proximal forearm.  ECF No. 37-2 at 2 (DSUF No. 4); see also ECF No. 37-4 at 41-42.  During plaintiff's orthopedic consultation with Dr. Andrew Ho on February 24, 2023, Dr. Ho ordered an MRI, CT scan, doppler study, and PET/CT scan testing of plaintiff's arm.  ECF No. 37-2 at 2 (DSUF No. 5); see also ECF No. 37-4 at 39-40.

On March 3, 2023, defendant saw plaintiff for various complaints related to his allergies, the mass on his left arm, and other concerns.  ECF No. 37-2 at 2 (DSUF No. 6).  During this appointment, plaintiff reported a mold allergy and complained that he had not seen a doctor in five months and had been unable to obtain an MRI.  Id.  Contrary to plaintiff's report, allergy testing had not shown a mold allergy and plaintiff had received an MRI during his orthopedic consultation with Dr. Ho.  Id.  During the appointment, plaintiff was difficult to keep on topic or redirect and insisted no one was caring for him.  Id.  Plaintiff claimed he could not take his prescribed medications due to a soy allergy.  Id.  Defendant ordered additional allergy testing for soy, meat, mold, and shellfish, as well as additional laboratory testing.  Id.  She prescribed medications and ordered follow-up for plaintiff's asthma complaints, as well as a mental health consultation.  Id.; see also ECF No. 37-4 at 34-37.  On March 21, 2023, plaintiff received doppler imaging of his left upper extremity, which showed "no evidence of DVT."  ECF No. 37-4 at 75-76.

Plaintiff saw Dr. Nageswaran for a follow-up appointment on March 24, 2023.  ECF No. 37-2 at 3 (DSUF No. 7).  During this appointment, defendant noted that plaintiff was behaving in a belligerent and uncooperative manner.  Id.  Plaintiff complained that he was not receiving a vegetarian diet from the kitchen, and he reported a negative reaction to Tramadol which had

8

recently been prescribed for pain.  Id.  However, plaintiff did not ask to discontinue the medication when defendant asked.  Id.  Instead, plaintiff answered that he "want[ed] a consult!" before refusing the rest of the visit and leaving the room.  Id.; ECF No. 37-4 at 71-72.  Dr. Nageswaran confirmed with the kitchen (in plaintiff's presence) that although plaintiff's food allergy results did not indicate actual allergy to meat or soy, he was receiving meal trays without soy.  Id. at 73.

Dr. Nageswaran saw plaintiff again on April 19, 2023.  ECF No. 37-2 at 3 (DSUF No. 8). His MRI results indicated lipoma, a noncancerous and benign tumor.[4]  Id.  During this appointment, defendant noted that plaintiff was being argumentative and insisted on needing certain care that was inconsistent with his diagnosed medical conditions.  Id.  He was also reporting ongoing concerns regarding soy in his food, which had previously been noted by other physicians.  Id.; see also ECF No. 37-4 at 30-31 (noting plaintiff's "apparent challenge accepting certain realities in discussing his medical concerns (e.g. medication beliefs, allergy beliefs, beliefs about what is in his tray, understanding of recommended txs")).

Plaintiff was seen on May 10, 2023 by other providers for complaints of arm pain.  ECF No. 37-2 at 3 (DSUF No. 9).  During this appointment, these providers observed that plaintiff has a history of reporting "inexplicable somatic complaints" and exaggerating his symptoms, such as reporting excruciating pain relating to his benign left arm lipoma.  Id.  His exaggeration of symptoms prompted "urgent" referrals for left forearm pain.  Id.  Plaintiff refused to believe the results of his MRI and continued to allege allergy concerns which were unsupported by testing or any evidence of allergic reactions.  Id.

On May 12, 2023, plaintiff was once again seen by defendant.  ECF No. 37-2 at 3-4 (DSUF No. 10).  During this appointment, plaintiff was observed to be belligerent with scattered thought content, and he would not answer whether he was taking his "life-saving" prescribed high blood pressure medication.  Id.  Plaintiff had been advised during an orthopedic consultation on April 21, 2023 that he did not need surgery as his pain was due to a lipoma.  Id.  However,

---

[4]  Plaintiff had also been seen the day before due to not eating.  Id.

plaintiff insisted that he wanted to see the MRI personally, and he left before defendant could complete a physical examination.  Id.; ECF No. 37-4 at 64-67.

Defendant saw plaintiff again one week later, on May 19, 2023.  ECF No. 37-2 at 4 (DSUF No. 11).  Plaintiff was complaining of arm pain, but no swelling or wounds were visible on examination and he could move his arm.  Id.  Although plaintiff complained of chest pain, he was not in distress and his breathing was observed as "effortless."  Id.  Defendant confronted plaintiff about a recent lie to a different provider that he required surgery, aka plaintiff was engaging in "staff splitting" by making varying reports to different providers, and she reiterated to plaintiff that no surgery had been recommended.  Id.  Plaintiff responded by accusing defendant of not reading the report.  Id.  Plaintiff's EKGs to follow up on his complaints of chest pain were also normal.  Id.  Plaintiff also appeared to be refusing to take most of his medications.  Id.  Plaintiff continued to complain that he was not being seen or listened to by his medical providers.  Id.  Defendant updated plaintiff's medical history to reflect a baseline of scattered history with contradictory and delusional claims.  Id.; see also ECF No. 37-4 at 59-62.

Defendant saw plaintiff again on June 1, 2023, when plaintiff was complaining about left arm pain relating to his lipoma.  ECF No. 37-2 at 4 (DSUF No. 12).  During that appointment, cardiac causes were ruled out after multiple emergency room visits.  Id.  According to defendant's treatment notes from this visit, plaintiff "reverted to saying no one is helping him, everyone is trying to kill him, started asking this writer for name again, continued to get argumentative so escorted out by officer."  ECF No. 37-4 at 55-57.

On June 22, 2023, plaintiff had an in-person appointment with a different provider and reported that he did want to be seen by Dr. Nageswaran.  ECF No. 37-2 at 4 (DSUF No. 13). While Dr. Nageswaran was temporarily out of the office, plaintiff was also seen by different providers for his complaints of arm and chest pain on July 14, 2023.  Id. (DSUF No. 14). Plaintiff's EKGs were normal and these providers observed plaintiff appeared to be demonstrating delusional disorder, somatic symptom disorder, or personality disorders.  Id. These providers' recommendations included short and frequent medical visits with consistent medical providers to establish trusting relationship between plaintiff and medical staff,

10

boundaries and time limits for visits, avoiding unnecessary tests and procedures not clinically indicated or which have been completed previously, and supportive psychotherapy as well as antidepressant medication or mood stabilizers.  See ECF No. 37-4 at 27-29 ("Mr. Kern demonstrates a combination of symptoms concerning or delusional disorder, somatic symptom disorder, personality disorder(s) and/or malingering.").  However, plaintiff was not amenable to psychotropic medications.  ECF No. 37-2 at 4 (DSUF No. 14).

On August 10, 2023, defendant reviewed plaintiff's August 2, 2023 left shoulder x-rays. ECF No. 37-2 at 5 (DSUF No. 15).  The results were consistent with calcific tendonitis, and follow-ups with orthopedic specialists were confirmed, although scheduling delays in the orthopedic clinic meant that plaintiff could not be seen by Dr. Ho until September 8, 2023.  Id. (DSUF Nos. 15-17); see also ECF No. 37-4 at 25-26 ("Findings most consistent with calcific tendonitis").

On August 25, 2023, Dr. Nageswaran initiated formation of a group of medical team members to meet weekly as part of a general care and behavioral plan to address plaintiff's recurrent complaints and concerns.  Id.  (DSUF No. 16); ECF No. 37-4 at 23-25.  On August 31 and September 1, 2023, plaintiff's care team, including Dr. Nageswaran, met to discuss plaintiff's treatment plan, recurrent complaints, and the challenges presented by his interactions with staff. ECF No. 37-2 at 5 (DSUF No. 17).  The group decided that plaintiff would be transferred to another part of the jail after his next scheduled orthopedic appointment in early September to implement a new care plan at that location which would involve providers, nursing, and custody working together.  Id.  Team members expressed concern that plaintiff was overconsuming medical services.  ECF No. 37-4 at 21 ("Purpose was to discuss PTs overconsumption of ACH services and build capacity for working relationship ACH.").  On September 1, 2023, the team discussed "the specific challenges with the pt's interactions and use of medical resources that interfere both with operations, as well as the timely and effective provision of his medical care" and the plan for his transfer to "2E" within the jail after his scheduled September 8 orthopedic appointment.  Id. at 22.  The care team had also "decided to hold off on any further imaging until pt is able to see Ortho."  Id. at 24.

On September 12, 2023, on orders from Dr. Nageswaran, plaintiff received an upper extremity sonography for his left arm pain which once again suggested lipoma, although other pathology could not be excluded.  ECF No. 37-2 at 5 (DSUF No. 18); ECF No. 37-4 at 19 ("A lipoma is most likely sonographically.").  In September 2023, Dr. Ho also referred plaintiff for a C-Spine MRI and EMG referral, although difficulties locating a neurologist and scheduling EMG testing ultimately delayed plaintiff receiving this neurology consultation before his release from the jail in March 2024.  ECF No. 37-2 at 5 (DSUF Nos. 19-20); ECF No. 37-4 at 5-6 (Dr. Ho's March 2024 treatment note that plaintiff was still waiting for "Neurology to work up for his left upper extremity pain" because the hospital neurology group was requiring an EMG be completed first), 7 (March 6, 2024 treatment note that "Pt has an EMG scheduled with offsite provider and the appt is within the next week"), 12 (November 2023 treatment note that plaintiff was still awaiting neurology work up), 15 ("Neurology/EMG referral in progress but having trouble getting a neurologist.").  Dr. Nageswaran also ordered a cardiac workup for plaintiff.  ECF No. 37-2 at 5 (DSUF No. 20).

On December 13, 2023, plaintiff's care team determined that he should be evaluated for antidepressants, along with biweekly medical visits.  ECF No. 37-2 at 6 (DSUF No. 21).  During each visit, plaintiff would be advised regarding expectations for future visits and he would be advised about upcoming cardiology appointments.  Id.; see also ECF No. 37-4 at 9-10.

On February 8, 2024, Dr. Nageswaran reviewed plaintiff's chart.  Plaintiff had been seen by the orthopedic, podiatry, and cardiac specialists, although he was still awaiting the neurological workup recommended by Dr. Ho.  ECF No. 37-2 at 6 (DSUF No. 22).  Due to plaintiff's pro per status and legal cases, plaintiff had been moved to the main jail.  As a result, Dr. Nageswaran advised plaintiff's care team that plaintiff needed a new care plan implemented at his new location.  Id.; see also ECF No. 37-4 at 8.

On March 15, 2024, a cervical spine MRI revealed multilevel degenerative disc disease resulting in central stenosis, which may have presented as referred pain in plaintiff's upper extremities.  ECF No. 37-2 at 6 (DSUF No. 23).  Because plaintiff did not believe he was experiencing problems with his neck and plaintiff wanted a neurosurgeon's opinion, a request

12

was placed for a neurosurgery case management consultation.  Id.  Treatment notes reflect that an EMG study was required before plaintiff could be seen in the neurology department at San Joquin General Hospital.  Id.  While his EMG appointment was being scheduled by medical staff in March 2024, plaintiff was released from the jail on March 21, 2024.  Id.; see also ECF No. 37-4 at 4-7 (March 6, 2024 treatment note reflecting that "Pt has an EMG scheduled with offsite provider and the appt is within the next week").

Defendant has provided a declaration from a Board-Certified Emergency Medical Doctor, Dr. Gary Vilke, who reviewed plaintiff's relevant medical records, as well as the complaint and the court's screening order in this case.  ECF No. 37-2 at 6 (DSUF No. 24).  Dr. Vilke opined that the treatment and care rendered to plaintiff by Dr. Nageswaran to a reasonable degree of medical certainty was timely and conformed to the applicable standard of care.  Id. at 6-7 (DSUF No. 25).  Dr. Vilke further opined that the care and treatment provided by defendant, as well as the other medical providers at the jail, did not cause any of plaintiff's claimed injuries.  Id. at 7 (DSUF No. 27).  To the extent that plaintiff's neurology consultation was delayed by the referral process and still pending when plaintiff was released from the jail, Dr. Nagaswaren was not responsible for any such delays as she was not directly involved in the process of scheduling or completing the neurology, neurosurgery, or EMG testing ordered by the orthopedic specialist, Dr. Ho.  Id. (DSUF Nos. 26, 29-30).  In any event, Dr. Vilke opined that the timeline of testing received by plaintiff, including the pending neurology consultation, was not uncommon as the referral processes, such as finding suitable placements and scheduling, can take time to complete.  Id. (DSUF Nos. 26).  Finally, Dr. Vilke opined that Dr. Nageswaran met or exceeded the requisite standard of care by forming a dedicated multi-disciplinary care team which included physicians, nurses, and mental health providers meeting weekly to discuss plaintiff's behavioral and general care treatment plan, recurrent complaints, and the challenges presented by his staff interactions to address his medical concerns while minimizing his persistent anxiety.  Id. (DSUF Nos. 28, 31).

IV.    DISCUSSION

A.    Plaintiff has Not Shown that Dr. Nageswaran Acted with Deliberate Indifference

As noted above, plaintiff alleges that Dr. Nageswaran violated his Fourteenth Amendment

13

rights by showing "total neglect" for his medical needs by ignoring or delaying necessary treatment. ECF No. 11 at 3.  Specifically, plaintiff asserts his medical problems originated when a blood pressure cuff was placed too tightly on his left arm on October 27, 2022, "creating a lesion," and he was held in a moldy jail cell from October 7, 2022, until October 17, 2022.  Id. at 3-4; ECF No. 40-1 at 2-3.  He alleges during his encounters with defendant, she "always turned her back" to plaintiff and would only identify herself as "Dr. N." without providing her full name. Id.  He alleges she refused to inform him of what was in the medications she prescribed to him, which he later learned included psychiatric medications.  Id.  Defendant told plaintiff that he would "never make it past her to see a neurologist" and indeed, plaintiff alleges he did not see a neurologist for at least one year.  Id.  Plaintiff alleges that he only learned of his medical diagnoses and nerve damage after a court ordered defendant to disclose this information to plaintiff within 72 hours, which she finally did on December 3, 2022.  Id.  As a result of her actions, plaintiff alleges that he is "in great pain, with a great loss of range of motion in my left arm" due to a "very painful mass on my forearm," and resulting "paralysis to my left hand and extreme pain to my left arm's bicep."  Id.

To prove that Dr. Nageswaran failed to provide constitutionally adequate medical care, plaintiff must show that she made an intentional decision with respect to his medical treatment which put him at substantial risk of suffering serious harm, and she failed to take reasonable available measures to abate that obvious risk, thereby causing his injuries.  See Sandoval, 985 F.3d at 669 (quoting Gordon, 888 F.3d at 1125) (brackets in original).  Her actions must be objectively unreasonable, something "more than negligence but less than subjective intent— something akin to reckless disregard.'"  Id.

It is unclear which intentional decisions Dr. Nageswaran made about plaintiff's medical care that plaintiff specifically believes caused his alleged injuries.  ECF No. 11 at 3-4.  As plaintiff has identified numerous complaints about Dr. Nageswaran in his First Amended Complaint and subsequent filings, however, the court will briefly address each category of complaints in turn.  Id.

14

### 1.   Plaintiff's Allegations Relating to October 2022

As a threshold matter, although plaintiff has repeatedly alleged that his left arm problems originated when a blood pressure cuff was placed too tightly on his left arm by medical staff causing a painful lump or lesion on October 27, 2022, and that his asthma/allergy problems were exacerbated by his incarceration in a moldy jail cell from October 7, 2022 until October 17, 2022 (ECF No. 11 at 3-4; ECF No. 40 at 2-3), plaintiff has not identified any nexus between either of these incidents and defendant.  Dr. Nageswaran neither placed the blood pressure cuff on plaintiff's left arm on October 27, 2022, nor had any influence on the specific conditions of his jail cell that month.  In fact, Dr. Nageswaran did not meet with plaintiff in person for the first time until January 20, 2023.  Plaintiff has therefore alleged no facts suggesting that defendant's decision-making could have caused either of these conditions.[5]

### 2.   Dr. Nageswaran's Behavior During Patient Visits

Plaintiff alleges that Dr. Nageswaran "always turned her back" to plaintiff during medical visits and identified herself as "Dr. N." rather than providing her full name.  ECF No. 11 at 3. Even assuming this is true, neither of these practices put plaintiff at substantial risk of suffering serious harm sufficient to establish a constitutional violation.  ECF No. 11 at 3; ECF No. 37-6 at 2 (Nageswaran Decl. ¶ 8) ("To the extent that I identified myself as 'Dr. N.' to Mr. Kern, this was consistent with my customary practice for ease of communication and for anonymity purposes."); ECF No. 37-4 at 55-57 (treatment note dated June 1, 2023 reflecting that plaintiff "reverted to saying no one is helping him, everyone is trying to kill him, started asking this writer for name again, continued to get argumentative so escorted out by officer.").

Plaintiff relatedly claims that he only learned of his "chest wall damage" and "left arm nerve damage" diagnoses after the Superior Court of Sacramento County ordered defendant "to reveal herself as plaintiff's primary care physician within 72 hours" in late November 2022, which defendant did during a December 3, 2022 visit.  ECF No. 11 at 3; ECF No. 40-1 at 3. However, the court is not aware of any other case involving plaintiff's claims against Dr.

[5]  To the extent plaintiff is alleging pain resulting from defendant's delay or inadequate treatment of his preexisting conditions, the court will address those specific allegations below.

Nageswaran.  Furthermore, plaintiff's assertion is contradicted by the record before the court, including treatment notes showing that plaintiff's first encounter with defendant did not take place until January 20, 2023, when defendant first physically examined plaintiff and ordered allergy testing, an x-ray of his left arm and abdomen, as well as a consultation with an orthopedic specialist based on his symptom complaints.  ECF No. 37-2 at 2 (DSUF No. 3); ECF No. 37-4 at 47-51; see also ECF No. 37-6 at 2 (Nageswaran Decl. ¶ 9) ("To the best of my knowledge, I have never been ordered by the Court to inform Mr. Kern of his diagnosis as alleged in his complaint against me.").

Plaintiff has not identified any evidence that would support a finding of deliberate indifference based on these matters.

3.    Dr. Nageswaran's Alleged Neglect and/or Delay of Treatment, Including EMG Testing and a Neurology Consultation

Plaintiff's primary complaint appears to be that Dr. Nageswaran showed "total neglect" for his medical needs by either ignoring or delaying necessary medical treatment.  ECF No. 11 at 3; ECF 40 at 1-2.  Plaintiff particularly emphasizes the delay of EMG testing and related neurological consultation that was ordered by plaintiff's orthopedic surgeon, Dr. Ho.  Id.  Plaintiff alleges that in June 2023, Dr. Nageswaran told him that he would "never make it past her to see a neurologist" and consequently, "I haven't in a year."  Id.; ECF No. 40 at 5-6.  Even assuming that Dr. Nageswaran made such statements, which the court must do on summary judgment, plaintiff's treatment records show efforts by the jail medical staff to (1) locate a neurologist who could see plaintiff, and (2) schedule EMG testing once staff learned this testing was required before plaintiff's consultation could take place.  There is no evidence in the treatment record or otherwise that defendant was personally involved in the scheduling process or took any action to delay EMG testing or plaintiff's neurological consultation.  ECF No. 37-2 (DSUF Nos. 29-30); ECF No. 37-6 at 1 (Nageswaran Decl. ¶ 5) ("I was not directly involved in the processes, scheduling, or completion of the neurology, neurosurgery, or EMG testing placed by Dr. Ho."); ECF No. 37-5 at 8 (Vilke Decl. ¶ 33) ("To the extent that there was any delay in receiving

requisite EMG testing, prior to receiving a neurology consultation, the delay was neither unusual, nor did it cause Mr. Kern's injuries …the EMG was not ordered by Dr. Nageswaran; it was ordered by other practitioners after it was learned a neurosurgery consult required the study to be performed before he was seen.").

Treatment records similarly do not show other evidence of neglect or delay by Dr. Nageswaran in treating plaintiff's pre-existing conditions.  Dr. Nageswaran treated plaintiff for a little over one year, between their first visit on January 20, 2023, and plaintiff's release from the jail on March 21, 2024.  ECF No. 37-2 (DSUF Nos. 3, 6-8, 10-12, 23); ECF No. 37-6 at 1 (Nageswaran Decl. ¶ 4).  During this period, in addition to submitting laboratory orders and specialist referrals, reviewing plaintiff's chart, and meeting periodically with the multi-disciplinary team she assembled to coordinate plaintiff's care, Dr. Nageswaran met with plaintiff personally on at least seven occasions to address his symptoms and complaints.  ECF No. 37-2 (DSUF Nos. 3, 6-8, 10-12).  During her first two visits with plaintiff, she performed a physical examination in response to his arm pain complaints.  Although defendant did not feel a lump on examination, she ordered x-ray imaging and scheduled a follow up appointment, additional allergy and laboratory testing, and an orthopedic consultation with Dr. Ho in response to plaintiff's reports of left arm pain.  ECF No. 37-2 at 2 (DSUF No. 3); ECF No. 37-4 at 34-37, 47-51.  Contrary to plaintiff's assertion in his First Amended Complaint that Dr. Ho also failed to prioritize his issues (ECF No. 1 at 3), Dr. Ho additionally ordered an MRI, CT scan, doppler study, and PET/CT scan testing.  ECF No. 37-2 at 2 (DSUF Nos. 4-5); see also ECF No. 37-4 at 39-42.  Plaintiff's test results revealed no evidence of deep-vein thrombosis, and the lump in his left arm was identified as a benign and noncancerous lipoma.  ECF No. 37-4 at 75-76; ECF No. 37-2 at 3 (DSUF No. 8).

Similarly, when plaintiff later complained to defendant that he was not receiving a soy-free meal from the kitchen (although the allergy testing revealed no soy or meat allergy), Dr. Nageswaran called the kitchen in plaintiff's presence to confirm his non-soy dietary preferences were being met.  ECF No. 37-4 at 71-72.  To the extent plaintiff would cooperate, defendant routinely performed physical examinations, and the cardiac causes of plaintiff's chest pain were

17

ruled out following multiple emergency room visits and normal EKG results.  See ECF No. 37-2 at 3-4 (DSUF Nos. 10-11).

In an effort to manage plaintiff's medical issues in light of his complex mental health picture, Dr. Nageswaran also "spearheaded the formation of a multi-disciplinary care team, which included physicians, nurses, and members of our mental health departments" which met periodically "to discuss a behavioral/general care plan for Mr. Kern, with the goal of addressing his medical concerns most efficiently and appropriately, while minimizing his persistent anxiety about them."  ECF No. 37-6 at 2 (Nageswaran Decl. ¶ 6); ECF No. 37-5 at 6 (Vilke Decl. ¶¶ 23-24).  Treatment notes show that beginning in August 2023, plaintiff's care team began meeting regularly to discuss plaintiff's persistent concerns, the challenges presented by plaintiff's tendency to "split" providers and report different information, and how best to provide treatment while reducing the strain on medical staff presented by plaintiff's recurrent visits.  See e.g., ECF No. 37-4 at 8, 20-21, 24.

In sum, plaintiff's treatment records from his encounters with Dr. Nageswaran and other providers during his incarceration at the jail show that plaintiff discussed his symptoms and complaints during each visit, and Dr. Nageswaran consistently took steps to address his concerns such as conducting a physical examination (if he would allow it), ordering additional testing, confirming he was receiving a soy-free diet from the kitchen, attempting to verify that plaintiff was taking his blood pressure medications as prescribed, and/or referring him to other specialists for follow-up.  On this record, a jury could not reasonably find that Dr. Nageswaran was making decisions to delay or neglect plaintiff's care, thereby subjecting him to a risk of serious harm.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

    4.   Plaintiff's Allegations Regarding Psychiatric and Blood Pressure Medications and Frequent Disagreement with Treatment Recommendations

Plaintiff further contends that Dr. Nageswaran refused to inform him what was in the

medications she prescribed to him, which he claims included psychiatric medications without his knowledge. ECF No. 11 at 3; ECF 40 at 1. Plaintiff's allegations are contradicted by the treatment record, which show that defendant and other providers frequently discussed with plaintiff why he could benefit from SSRIs and other medications to help treat his pain, anxiety, and other mental health symptoms. For example, treatment notes from June 1, 2023 reflect that defendant "recommended trying Cymbalta again (other option could be TCA) but [plaintiff] reverted to his typical pattern of giving reasons he doesn't want to that are unrelated to what is being offered," but defendant nevertheless "advised that many meds for pain are also used for psych because all involve the nervous system[.]" ECF No. 37-4 at 57; ECF No. 37-2 at 4 (DSUF No. 14). Plaintiff's opposition brief also appears to concede that defendant was attempting to educate and persuade plaintiff regarding how such medications could be beneficial, not that she was administering them to him without his knowledge.[6] See ECF No. 40-1 at 3 ("Dr. Nageswaran informed plaintiff she didn't need to consult plaintiff on any meds she prescribed to plaintiff she just insisted on trying to get plaintiff to take psych meds, due to complaints of severe pain. Plaintiff always refused…"). Even if plaintiff did receive psychiatric medication during his incarceration at the jail without his knowledge, however, plaintiff has not identified any specific injury resulting from defendant's conduct.

To the extent plaintiff alleged for the first time in his opposition that Dr. Nageswaran failed to take adequate steps to manage his high blood pressure (ECF No. 40 at 2), the treatment records show defendant ordered frequent blood pressure checks (twice per week) and made persistent efforts to persuade plaintiff of the importance of regularly taking his prescribed blood pressure medication despite his frequent refusal to do so. See ECF No. 37-4 at 37-38 (March

---

[6] For example, treatment notes from other providers dated August 31, 2023 reflect that plaintiff's care team was discussing prescribing plaintiff an anti-psychotic to help manage his serious mental health symptoms (ECF No. 37-4 at 21), but not that defendant prescribed or administered such medications. See also ECF No. 37-4 at 28-29 (Certified Nursing Assistant's note that anti-depressants and anti-psychotic medication may be beneficial); ECF No. 37-5 at 6 (Vilke Decl. ¶ 28) (observing that a case consultation involving defendant and other doctors dated December 13, 2023 discussed how "an evaluation for antidepressants would be scheduled as well as biweekly medical visits").

2023 treatment note that defendant "[a]dded new test order of blood pressure checks 2x week"), 60-61 ("Appears that not taking most pills . . . Last time documented took BP med was 5/14/23. Rest are documented as refusals."). For example, plaintiff advised defendant during an in-person visit on May 19, 2023 that he would not take his blood pressure medication "until he gets full description of each" and when defendant reminded plaintiff that "we already discussed that before," plaintiff switched the subject and later told defendant that "he doesn't trust any meds given to him anymore because he had psych meds snuck into his medicine before and doesn't trust what he's given." Id. at 61. To the extent that plaintiff's high blood pressure was poorly managed during his incarceration at the jail, treatment records suggest that plaintiff's poor history of medication compliance, and not defendant's failure to treat his high blood pressure, were the likely cause. See e.g., ECF No. 37-4 at 35 (defendant's review of "recent trend of elevated BPs" and plaintiff's report that he was afraid to take his blood pressure medication if he feels it may be too low and he "thought SBP < 130 was too low"). Without more, plaintiff's conclusory allegations regarding psychiatric and high blood pressure medications are insufficient to show that defendant's decision-making subjected him to a serious risk of harm, or in fact caused him any injury.

It is relevant to evaluation of plaintiff's claims that his treatment record shows he frequently did not accept his objective test results and diagnoses, nor comply with his providers' recommended course of treatment. See ECF No. 37-4 at 30-31 (noting plaintiff's "apparent challenge accepting certain realities in discussing his medical concerns (e.g. medication beliefs, allergy beliefs, beliefs about what is in his tray, understanding of recommended txs"). Plaintiff's disagreement with his providers' recommendations, even when confronted with objective tests results, was so persistent that other providers diagnosed plaintiff with delusional disorder, somatic symptom disorder, and/or personality disorders. See ECF No. 37-4 at 27-29 ("Mr. Kern demonstrates a combination of symptoms concerning or delusional disorder, somatic symptom disorder, personality disorder(s) and/or malingering."); ECF No. 37-2 at 4 (DSUF No. 14). Similarly, defendant explains in her declaration that plaintiff "often refused to believe the results of his testing, recommendations, and that his dietary requests were honored" and repeatedly

20

sought urgent care for routine complaints, while abruptly leaving appointments without completion of his physical examinations and refusing to take his prescribed medications. ECF No. 37-6 at 2 (Nageswaran Decl. ¶ 6). Plaintiff's behavior "overwhelmed staff and made his treatment and care difficult to manage." Id. Even assuming the facts in the light most favorable to plaintiff, a difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding the appropriate course of treatment does not by itself amount to deliberate indifference to serious medical needs. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

>    5.    Plaintiff's Alleged Injuries

Finally, plaintiff alleges that as a result of Dr. Nageswaran's actions, he experienced "great pain, with a great loss of range of motion in my left arm" due to a "very painful mass on my forearm," and resulting "paralysis to my left hand and extreme pain to my left arm's bicep." ECF No. 11 at 3; see also ECF No. 51 at 2 (plaintiff's allegation that defendant was "continuously delaying my neurologist appointments, cancelling them and eventually stating the Jail lost their contract with the neurologist."). As discussed above, however, plaintiff's treatment records reflect that plaintiff had a benign lipoma in his left arm, as well as degenerative changes in his neck which could cause some referred pain in his upper extremities. ECF No. 37-4 at 5-6.

To the extent plaintiff's pain or issues in his left arm could have been related to neurological issues, treatment notes show that Dr. Nageswaran had no role in delaying plaintiff's neurological consultation, which was ordered by orthopedic surgeon Dr. Ho in September 2023 but delayed for several months due to medical staff's initial difficulty locating a neurologist and scheduling a required EMG before a neurology consult at San Joaquin General Hospital could take place. See ECF No. 37-4 at 5-6 (March 2024 treatment note reflecting that "Neurology will not see this pt until EMG is completed per SJGH Special Care"), 12-13 (November 17, 2023 treatment note that Dr. Ho placed neurology referral in September 2023 and plaintiff was awaiting nerve conduction and EMG study); 15 (October 2023 treatment note that "Neurology/EMG referral in progress but having trouble getting a neurologist"); ECF No. 37-5 at 6 (Vilke Decl. ¶¶ 25-27, 30, 33). There is no evidence that defendant was involved in preventing

or delaying plaintiff's neurological consultation, or that the scheduling delays caused plaintiff's injuries.  ECF No. 37-5 at 6 (Vilke Decl. ¶ 33).[7]

6.  Conclusion as to Deliberate Indifference

On this record, even construing the facts in the light most favorable to plaintiff, there is no evidence that Dr. Nageswaran made an intentional decision with respect to plaintiff's medical treatment which put him at substantial risk of suffering serious harm, or that she failed to take reasonable available measures to abate such obvious risk, or that she caused his injuries. Although plaintiff consistently disagreed with the medical treatment he was provided during his incarceration at the jail, he has offered no admissible evidence supporting his claims that Dr. Nageswaran's decision-making put him at substantial risk of harm.  Plaintiff has not shown that he is competent to provide expert opinions on the standards and appropriateness of the treatment provided, whereas defendant provided expert testimony verifying that defendant's actions met or exceeded the requisite standard of care.  See ECF No. 37-5 at (Vilke Decl. ¶¶ 30-34).  Absent any competent evidence, plaintiff's arguments amount to nothing more than a difference of opinion that cannot support a claim of deliberate indifference.  See Toguchi, 391 F.3d at 1058. Accordingly, plaintiff has failed to establish a genuine dispute of fact, and defendant's motion for summary judgment should be granted.

B.  Qualified Immunity

Government officials are immune from civil damages "unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the court must consider the following: (1) whether the alleged facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident.  Saucier v. Katz, 533 U.S.

---

[7] Plaintiff notes in his reply brief that he did see a nerve specialist on March 17, 2025, and eventually had surgery on June 24, 2025, although he has not provided any supporting documentation.  ECF No. 51 at 2.

194, 201 (2001) overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling Saucier's requirement that the two prongs be decided sequentially).  These questions may be addressed in the order most appropriate to "the circumstances in the particular case at hand." Pearson, 555 U.S. at 236.  Thus, if a court decides that plaintiff's allegations do not support a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.  On the other hand, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court need not determine whether plaintiff's allegations support a statutory or constitutional violation.  Pearson, 555 U.S. at 236-42.

The court has established that, taking the evidence in the light most favorable to plaintiff, he has not demonstrated a violation of his Fourteenth Amendment rights.  It is therefore unnecessary to reach the qualified immunity issue on these claims. The court therefore declines to do so.

VII.    PLAIN LANGUAGE SUMMARY FOR A PRO SE LITIGANT

The magistrate judge is recommending that defendant's motion for summary judgment be granted.  You have not identified evidence that shows the care and treatment Dr. Nageswaran provided was medically unacceptable and amounted to deliberate indifference to your medical needs.  Your own beliefs and opinions about the medical care you received is not enough.  The district judge will make the final decision after considering any objections that you submit.

CONCLUSION

For the reasons explained above, IT IS HEREBY RECOMMENDED that:

1.  Plaintiff's motion for summary judgment (ECF No. 49) be DENIED as untimely, his reply brief (ECF No. 51) be construed as a supplemental opposition to defendant's motion for summary judgment and the Clerk of the Court be directed to update the docket accordingly.

2.  Defendant's motion for summary judgment (ECF No. 37) be GRANTED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written

23

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within twenty-one days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 26, 2026

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE